FILED
JAMES J. VILT JR., CLERK
9/2/2026
U.S. DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**LOUISVILLE JURY DIVISION**

WILLIAM HALE, Individually and on Behalf of All Others Similarly Situated,

Plaintiff,

v.

PAPA JOHN'S INTERNATIONAL, INC., TODD ALLAN PENEGOR and RAVI THANAWALA,

Defendants.

Case No. 3:26CV-685-DJH

**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

**CLASS ACTION**

Demand for Jury Trial

Plaintiff William Hale ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, alleges in this Complaint for violations of the federal securities laws (the "Complaint") the following based upon knowledge with respect to his own acts, and upon facts obtained through an investigation conducted by his counsel, which included, *inter alia*: (a) review and analysis of relevant filings made by Papa John's International, Inc. ("Papa Johns" or the "Company") with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of Papa Johns' public documents, conference calls, press releases, and stock chart; (c) review and analysis of securities analysts' reports and advisories concerning the Company; and (d) information readily obtainable on the internet.

Plaintiff believes that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the

allegations contained herein are known only to the defendants or are exclusively within their control.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of all investors who purchased or otherwise acquired Papa Johns' common stock between August 7, 2025, and August 5, 2026, inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws (the "Class").

2. Defendants provided investors with material information concerning claims that Papa Johns' strategic transformation was working to stabilize and improve the Company's growth potential. Defendants' statements included, among other things, confidence in the Company's strategic transformation and their ability to generate increased value and sustain competitive growth against a cautious consumer market through a "barbell strategy with strong value messaging and a compelling full margin product."

3. Defendants provided these overwhelmingly positive statements to investors while, at the same time, disseminating materially false and misleading statements and/or concealing material adverse facts concerning the true state of Papa Johns' transformation; notably, that it was "taking longer than expected," and ultimately was unable to prevent further market share losses. Papa Johns ultimately required a significant shift in strategy toward a sharp increase in promotional efforts to abate the Company's declining competitive position. Such statements absent these material facts caused Plaintiff and other shareholders to purchase Papa Johns' securities at artificially inflated prices.

4. On August 6, 2026, Papa Johns announced an 8.3% decrease in North American comparable sales, the suspension of its dividend, and a sharp reduction in its 2026 outlook from a

3% decline in North American comparable sales at the midpoint to a 7% annual decline. The Company attributed its strategic shift and guidance reset on the soft consumer trends and the execution of Papa Johns' own turnaround efforts, admitting they were unable to "meet the consumer as much as [they] should have," and the rebuilt innovation pipeline was "not bringing in as many new customers" as had been expected.

5. Investors and analysts reacted immediately to Papa Johns' revelation. The price of Papa Johns' common stock declined dramatically. From a closing market price of $29.75 per share on August 5, 2026, Papa Johns' stock price fell to $24.64 per share on August 6, 2026, a decline of about 17.18% in the span of just a single day.

## JURISDICTION AND VENUE

6. Plaintiff brings this action, on behalf of himself and other similarly situated investors, to recover losses sustained in connection with Defendants' fraud.

7. The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

8. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

9. Venue is proper in this District and in the Louisville Jury Division pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b), as one of Defendant Papa Johns' co-headquarters is located in this District and a significant portion of its business, actions, and the subsequent damages to Plaintiff and the Class, took place within this District.

10. In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce,

including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

**THE PARTIES**

11. Plaintiff purchased Papa Johns common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the Defendants' fraud. Plaintiff's certification evidencing his transaction(s) in Papa Johns is attached hereto. Plaintiff resides in Indian River County, Florida.

12. Papa John's International, Inc. is a Delaware corporation that is co-headquartered in Atlanta, Cobb County, Georgia and Louisville, Jefferson County, Kentucky, with principal executive offices located at 788 Circle 75 Parkway SE, Atlanta, GA 30339 and 2002 Papa John's Boulevard, Louisville, Kentucky 40299, respectively.

13. During the Class Period, the Company's common stock traded on the NASDAQ Stock Market (the "NASDAQ") under the symbol "PZZA."

14. Defendant Todd Allan Penegor ("Penegor") was, at all relevant times, the President, Chief Executive Officer, and a Director of Papa Johns.

15. Defendant Ravi Thanawala ("Thanawala") was, initially the Chief Financial Officer and Executive Vice President, International, of Papa Johns until his promotion on November 18, 2025. At all relevant times from November 18, 2025, until his departure from the company on June 30, 2026, Defendant Thanawala was the Chief Financial Officer and President of the North American business. Following his departure, Defendant Thanawala continued to serve in an advisory capacity until July 31, 2026.

16. Defendants Penegor and Thanawala are sometimes referred to herein as the "Individual Defendants." Papa Johns together with the Individual Defendants are referred to herein as the "Defendants."

17. The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Papa Johns' reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

18. Papa Johns is liable for the acts of the Individual Defendants, and its employees under the doctrine of respondeat superior and common law principles of agency as all the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

19. The scienter of the Individual Defendants, and other employees and agents of the Company are similarly imputed to Papa Johns under respondeat superior and agency principles.

## SUBSTANTIVE ALLEGATIONS

### *Company Background*

20. Papa Johns is a global chain pizza company that both operates and franchises restaurants in North America and various international markets.

21. The Company reports under four segments: Domestic Company-owned restaurants, North America franchising, North America commissaries, and International.

***The Defendants Materially Misled Investors Concerning***

***The Purported Effectiveness of Papa Johns' Strategic Efforts to Transform the Business***

*August 7, 2025*

22. On August 7, 2025, Defendants issued a release publishing their second quarter fiscal 2025 results, highlighting, in pertinent part, that "North America comparable sales increased 1% from a year ago as Domestic Company-owned restaurants were flat and North America franchised restaurants were up 1%; International comparable sales increased 4% compared with the prior year second quarter."

23. Defendant Penegor made a statement for the release, praising the results as proof of a working strategy in North America, stating:

> Papa Johns second quarter results exceeded our expectations and ***are evidence that our strategy is working***. We returned to comparable sales growth in North America and achieved strong sales growth internationally, driven by transaction gains as we win more customer visits with a focus on our core pizza business
>
> Our progress in the second quarter reinforces my confidence that ***we are on the right track to deliver significant, sustainable profitable growth and increased value*** for all Papa Johns stakeholders

(Emphasis added).

24. During the same-day earnings call, Defendant Penegor confidently touted the Company's progress on its transformation strategy and the alleged resultant to positive comparable sales growth in North America, stating, in pertinent part:

> ***The progress we've made is substantial***. For example, ***we've successfully returned the company to positive comparable sales and transaction growth in North America.*** With our barbell strategy and enhanced loyalty program in place, our brand strength has improved significantly. And strategic investments are enabling us to deliver great experiences for our customers.
>
> Taken together, ***I am confident we are on the right path towards profitable growth.*** Our goal is to be the best pizza makers in the business, and we are laser-focused on continuing to execute our strategy to grow restaurant sales, generate sustainable profits through the system and build long-term value for all of our stakeholders.
>
> . . .
>
> Our second quarter results, which exceeded our expectations are ***evidence that our strategy is working. The North America business returned to positive comparable sales, ending the quarter up 1%.*** We also delivered sequential improvement across several key international markets, driving 4% comparable sales growth in Q2.

(Emphasis added).

25. Speaking to the transformation directly, Defendant Penegor highlighted the "progress" the Company had made on the "plans to transform the Papa John's business." In pertinent part, Defendant Penegor outlined the "5 priorities" of the transformation:

> ***First, we are focused on improving our core product proposition and premium menu innovation throughout our restaurants***. We're building a menu to not only capture the hearts and stomachs of customers, but also generate margins that improve profitability for our franchisees. Our consumer research consistently shows that exciting menu innovations bring in new customers.
>
> . . .
>
> Turning now to the progress we've made on our ***second priority***, which is ***to amplify our marketing message***. We've been hard at work creating a marketing message that ***speaks to Papa John's differentiation among QSR pizza companies***. At the end of June, we launched the second chapter of our popular Meet the Makers marketing campaign, leaning into the 6 simple ingredients of our fresh, never-frozen original dough. Six simple ingredients is a strong point of differentiation with high importance among consumers.
>
> Our customers have told us that using simple, fresh ingredients is our biggest and most important differentiator, and we've doubled down on that message in our national marketing campaign. Consumers want high-quality pizza with real ingredients and ***our messaging strategy meets them where they are***, emphasizing

> our points of differentiation and showcasing select core products at relevant price points. This will be part of our long-term strategy to win customers and deliver compelling four-wall economics. Ultimately, we think the world deserves better pizza, and we are here to deliver it.
>
> . . .
>
> Our third strategic priority is investing in our technology infrastructure. Under Kevin Vasconi's leadership, we are implementing our technology road map with the goal of reestablishing Papa John's as a best-in-class technology leader in QSR. By better utilizing data and leveraging AI, we believe we can create a more seamless experience across our digital assets and own channels and better connect with customers.
>
> . . .
>
> Our ***fourth priority, differentiating our customer experience across all of our channels, underpins each of our strategic pillars***. Starting with our loyalty program. We continue to benefit from the lowering of our redemption threshold late last year and allowing members to unlock Papa Dough faster. Though this enhancement decreased our overall order ticket by approximately 100 basis points in the quarter, the benefits far outweigh the ticket impact.
>
> . . .
>
> Our fifth strategic priority is partnering with and evolving our franchisee base to drive profitable growth through market share gains, accelerating restaurant development in our most impactful markets and sustainably improving our restaurant economic model.

(Emphasis added).

26. Throughout the call, Defendants highlighted increasing consumer caution in the beginning of the third quarter. First, Defendant Thanawala, while discussing reiteration of their 2025 guidance, stated, in pertinent part:

> For 2025, we continue to expect system-wide sales to increase between 2% and 5%. From a comparable sales perspective, we still anticipate that North America comparable sales will be flat to up 2% in 2025. ***Through the first 5 weeks of the third quarter, North America comparable sales are down approximately 1% as we've seen a more cautious consumer and softer carryout business***.
>
> ***Given our plans to leverage our barbell strategy with strong value messaging and a compelling full margin product, we expect that North America comparable***

> ***sales will accelerate through the remainder of the third quarter. We anticipate further acceleration in the fourth quarter as we build momentum and layer in new product innovation.***
>
> Internationally, we are pleased with the continued improvement that we are seeing across our restaurants. Given recent trends and the operational strength in our priority markets, we are raising our 2025 international comparable sales growth outlook to a range of 2% to 4%.

(Emphasis added).

27. During the question-and-answer section of the call, Defendant Penegor reiterated the consumer softness, as well as the assurances that "momentum … continues" and that investors will see continued "sequential improvement in our business throughout the back half," in pertinent part, during the following exchange:

> <Q: Andrew Strelzik – BMO Capital Markets Equity Research – Senior Restaurant Analyst> You mentioned 2Q exceeding your expectations. North America comps were a little ahead of what it seems like you had expected. Where do you think you're getting more traction than you anticipated across those initiatives?
>
> And then just kind of as a follow-up. I know it's only 1 month, so I don't want to make too much of that, but what gives you confidence in the reacceleration over the balance of the year based on what's in your pipeline?
>
> <A: Todd Allan Penegor> Yes. Thanks for the question, Andrew. ***Very proud of the work the team has done to get North America growing again at plus 1% on same-restaurant sales comps***, really on the heels of transaction growth being up 1%. So we are bringing in more customers more often. I think it's a combination of everything that we have out there, return to a more traditional barbell, had some innovation for the first time in a while, which helped on the high end of the barbell with the Cheddar Crust Pizza. Putting Shaq-a-Roni as more permanent long-term item has been a positive.
>
> But the foundational work that we've done over the last 9 months really makes sure we have the tools at our disposal to lean into CRM to make sure we can better connect to our consumer, to leverage our loyalty program, which is driving a lot of frequency and we continue to gain members on that front. We're seeing some really nice growth in our loyalty program.
>
> And as we look forward, the opportunity is to really leverage innovation a little bit more, to recruit customers back into our brand. We know if we can bring some lapsed in, we can bring some new in, we can get them converted into our loyalty

> program and we can grow and drive some nice momentum in our business moving forward.
>
> Yes, ***we're in the early innings of third quarter. More cautious consumer. We're watching in our carryout business probably started a little bit softer than we had hoped for at the beginning of the quarter***, but we can quickly check and adjust on that front. We're lapping over at the beginning of the quarter some heavier promotional activity that supported some of our rhythm breakers, Papadias, Papa Bites last year, but ***our core pizza business, which was up 6% in the second quarter, continues to grow nicely into the third quarter***. So we're really feeling good about the core business.
>
> And we just launched some more innovation. We've got Garlic 5-Cheese at $11.99 price point just launched coming up. We've got an on-trend shareable pizza format with a new lineup of dipping sauces. And we got in test what we're calling the Grand Papa, which is our biggest pizza ever and we're excited about that one, too.
>
> So ***we've got a lot at our disposal to continue to compete really well in the back half of the year. And you will see sequential improvement in our business throughout the back half*** to deliver on our commitment in North America flat to plus 2%. And then importantly, we still have a lot of momentum on international, right? We ended up calling up the year on international was flat to 2% to 2% to 4%. And ***the momentum that we saw in the second quarter continues into the third quarter.***

(Emphasis added).

*November 6, 2025*

28. On November 6, 2025, Defendants issued a press release discussing their third quarter fiscal 2025 results, featuring a 3% decline in North American comparable sales.

29. In pertinent part, Defendant Penegor highlighted the continued consumer softness in North America, but assured investors they were reacting to increase their competitiveness through the ongoing transformation strategy implementations:

> Our third quarter results reflect strong performance and building momentum of our transformation work in International markets, offset by ***softer North American sales given current consumer sentiment and a promotional QSR marketplace***. We are ***sharpening our value proposition and rebuilding our innovation pipeline to add new sales layers to our business. This relentless flow of innovation will allow us to better respond to consumer needs, leveraging our competitive advantages of quality, craftsmanship, and freshness at an accessible price***.

> As we ***execute our transformation strategy, we are also strengthening our competitiveness in strategic markets and developing a world-class technology platform to differentiate the customer experience***. Concurrently, we are taking action to remove non-customer facing costs from the business and build a more nimble, efficient organization. We have identified substantial savings, and we expect to identify additional efficiency opportunities as our review progresses. Papa Johns is a strong brand with a healthy balance sheet, and ***I'm confident that the work underway will position us to drive sustainable, profitable growth and create value for our customers, franchisees, and shareholder***.

(Emphasis added).

30. During an earnings call following the quarterly publication, Defendant Penegor discussed how changes to innovation and a better value proposition would keep Papa Johns competitive and "address near-term consumer pressure," in pertinent part:

> Within North America, core pizza sales were flat. We sold 3% more pizzas and 4% more pizzas per order, but total pizza sales were effectively flat as order mix shifted to more medium pizzas and fewer added toppings. ***The majority of North America sales pressure was driven by declines in product outside of our core pizza offering, including wings, bread sides, Papadias and Papa Bites.***
>
> As consumers are pressured, they tend to control their spend by focusing on center of plate rather than adding sides and desserts. ***As part of our product innovation work, we are taking action to develop more compelling sides and desserts at more accessible price points. I'll share more about that in a moment.***
>
> . . .
>
> Ultimately, ***we are positioning Papa John's to compete better in 2026*** and beyond. We are ***aligning our system around a more comprehensive value proposition to address near-term consumer pressure***. We are building a stronger, more impactful product pipeline, with a relentless flow of innovation built around 3 major new platforms to extend our addressable market and expand margin, including reimagined sides to drive add-ons.
>
> ***We are strengthening our competitiveness in strategic markets***, both domestically and internationally. We are removing noncustomer-facing costs from the business. We are creating a more nimble, efficient organization. We are standing up a technology platform to differentiate the customer experience. We are building a more efficient supply chain and improving our food cost, and we are accelerating our North American refranchising program.

> ***We are confident that our transformation work will ultimately position Papa John's to generate sustainable, profitable growth across our portfolio, better respond to customer needs and effectively navigate a variety of consumer environments, all while maintaining a healthy balance sheet.***

(Emphasis added).

31. Defendant Penegor continued, claiming a "distinct competitive advantage to win new customers," stemming from new innovation at competitive price points under the Company's transformation strategy, stating, in pertinent part:

> ***While our transformation is in the early innings, we are making progress***. And as you've heard today, we are committed to accelerating the momentum, including pursuing cost actions, faster refranchising and meaningful operational improvements. Let me share more.
>
> First, we are relentlessly focusing on our core product proposition and premium innovation. Our culinary and product development teams have rebuilt and reinvigorated our innovation framework, which is now grounded on 3 approaches: form innovation, size innovation and platform innovation.
>
> In September, we launched Papa Dippa, ***the first innovation under the new framework, showcasing form innovation***. Papa Dippa is an on-trend shareable pizza cut into strips made specifically for dipping. Our newest innovation launched this week is built around size. The Grand Papa is our largest pizza ever with deli-style pepperoni and large foldable slices, perfect for sharing.
>
> ***In 2026, we expect to have a consistent flow of impactful innovation at compelling price points, which will better allow us to drive sales in a challenging consumer environment and extend our addressable market***. For example, we are reimagining our side offerings and developing more sides at accessible price points to drive add-on sales and margin expansion.
>
> Additionally, our 2026 innovation pipeline begins to expand our aperture beyond traditional QSR pizza and adds new sales layers to our business, including menu items more akin to what you would find at your neighborhood pizzeria. ***Combining this kind of right price innovation with Papa John's quality, craftsmanship, variety and freshness results in a distinct competitive advantage to win new customers.***

(Emphasis added).

32. Defendant Thanawala discussed the quarter's financial results and highlighted management's confidence in the rebuilt pipeline to improve trends in the softer consumer and more promotional environment that Papa Johns acknowledged would continue into 2026, in pertinent part:

> As Todd discussed, North America comparable sales decreased 2.7% in the third quarter, with the majority of sales pressure driven by declines in products outside of our core pizza offering. ***To improve this trend, and drive add-ons and ancillary sales, we are rebuilding our innovation pipeline, including reimagining our sides offering.***
>
> . . .
>
> ***We've revised our outlook to reflect the impact of a softer consumer backdrop and a more promotional QSR marketplace, which we expect to persist through the remainder of the year and into 2026.***
>
> . . .
>
> Looking ahead, we are positioning Papa John's to compete better in 2026, play the game differently, while continuing to transform the brand and fuel sustainable profitable sales growth in the future. Papa John's is a strong brand, with a healthy balance sheet, and the work underway will position us to drive long-term earnings power across all aspects of our organization. ***We are confident in our strategy. We recognize the substantial upside ahead, and we are moving forward with excitement and focus as we transform the business.***

(Emphasis added).

33. During the call, Defendant Penegor further articulated his confidence in the Papa Johns' trajectory under the transformation, claiming awareness of the softer consumer and higher promotional environment, as well as confidence in the Company's ability to respond to it by utilizing a "balanced barbell" of improving innovation while still competing on value, in pertinent part, during the following exchange:

> <Q: Andrew Strelzik – BMO Capital Markets Equity Research – Senior Restaurant Analyst> I wanted to ask, Todd, a little bit over a year since you joined Papa John's. I'd be curious to get your assessment of the turnaround progress and where you are today versus where you thought you might have been when you set out on this

journey? And where do you feel like you're maybe farthest along? And what areas maybe been a little bit slower to materialize?

<A: Todd Allan Penegor> Yes. Thanks for that question, Andrew. And as you think about the things that I feel good about, right, over the course of the last 14, 15 months, ***we really improved the value proposition and perception of the Papa John's brand. We continue to improve the quality perception and our brand health***, which are positive for the long run, and those are foundational work that we'll continue to do.

***Our innovation pipeline needed to be rebuilt. You're starting to see some of that news come to life here at the back half of 2025. But really excited around a steady dose of innovation into 2026, not just around core pies, but around other occasions that can help drive the business, whether that be reimagined sides or other handheld opportunities into the future.***

So, I think there's opportunities to do that. The work we've done to really work our oven calibration and perfect bake to make sure we're making better core pizzas and working with our franchise community to deliver quality product time and again, work always to do on that. But that has set a strong foundation for us to continue to lean into, and it allows us to really open up the opportunity to innovate even more as we get time and temperature set right in our ovens in the restaurants.

In our international business, we've made a tremendous amount of progress. A lot of heavy lifting was done just before I got here. We're starting to see the fruits of all of those hard work, and it's really driving our business, and we got really some strong momentum in that business across the globe, and it's widespread.

***As you think about where the latest environment is around the consumer, around the competitive landscape, we need to make sure that we can continue to compete hard on both sides of the barbell***. Quality is always going to be important. ***We need innovation to bring in those laps to new customers, but we also need to make sure we've got a really balanced barbell to make sure we can compete on the value proposition side too.*** Do it our way, do it appropriate for the Papa John's brand, do it in a way that brings in more customers more often to drive transactions for the long run. And that's where the focus is going to continue to be.

***You'll see that in the promotional cadence that we have year to go and into next year. And you'll also see that in how we bring our innovation to life to make sure they're priced appropriate for where the consumer is today. So, we're going to meet the consumer where they're at today. We'll continue to build this brand for the future.***

(Emphasis added).

*November 18, 2025*

34. On November 18, 2025, Defendants published a release announcing that Defendant Thanawala had been "promoted to Chief Financial Officer and President, North America." The release further clarified that the "Company's International business will be led by Chris Lyn-Sue," who was also promoted internally.

*February 26, 2026*

35. On February 26, 2026, Papa Johns published its fourth quarter and full year 2025 results. In pertinent part, the release attested "North America comparable sales decreased 5% as Domestic Company-owned restaurants were down 6% and North America franchised restaurants were down 5%; International comparable sales were up 6%, all compared with the prior year fourth quarter." For the full year, North American sales fell 2%, in line with the reduced guidance from the previous quarter.

36. During the corresponding earnings call, Defendant Penegor praised the progress in Papa Johns' strategic transformation, in pertinent part:

> 2025 was a year of transformation for Papa John's as we made improvements across the company to our brand health, technology platform, innovation pipeline, customer experience, restaurant fleet and cost structure. These actions, together with key leadership appointments and organizational changes, ***represent meaningful progress against our transformational objectives***. We have ***substantially improved our brand health as well as our value and quality perception with our customers, which will translate into market share gains***.

(Emphasis added).

37. Defendant Penegor then discussed Papa Johns' growth opportunities in 2026, and how the Company's innovation work under its strategic transformation will help achieve them, in pertinent part:

> As we look to 2026, ***we are positioning the business to win in a category that has staying power and growth opportunities***. Pizza is a go-to for families and friends in everyday moments, special occasions and gatherings and that deep-rooted consumer affection ensures pizza remains one of the most durable food categories. By being the best pizza makers in the industry, I am confident Papa John's will capture this global market opportunity. ***Our 2 largest opportunities to gain share are: building on the advancements we've made in value perception and leveraging our rebuilt innovation pipeline to win new customers, elevate our pizza order mix to more premium pizzas, drive add-ons and expand our total addressable market.***
>
> . . .
>
> Part of our product innovation work in 2026 is centered around ***crafting compelling side items at accessible price points, which we believe will entice customers to look beyond the center of the plate and drive benefits to total ticket, sales and 4-wall margins***.
>
> . . .
>
> ***With the competitive dynamics in the QSR marketplace, we are equally focused on sharpening our marketing message***. We know pizza is a game played nationally, but won locally. I'm thrilled to share that ***we have reestablished co-ops across 50 markets in the United States, which includes the majority of our priority markets. These co-ops enable franchisees across regions to pool resources for more effective localized targeting and brand support***. Now nearly half of our North American system-wide sales are supported by an advertising co-op with collaborative local campaigns.
>
> . . .
>
> ***We have established clear success criteria and are closely tracking returns on these investments and we are already seeing green shoots***. Our international business provides a compelling proof point delivering 5 consecutive quarters of positive comparable sales through focused investment in product, customer experience and priority markets. In summary, ***as we accelerate our transformation, we are making visible progress executing our strategy. We are confident in our direction and in our ability to deliver sustainable profitable long-term growth and capitalize on opportunities across the category.***

(Emphasis added).

38. Defendant Thanawala took over the call to discuss the financial results with more particularity, highlighting Papa Johns' fourth quarter results. In pertinent part, he touted the

Company's effectiveness in pivoting against a weaker consumer sentiment and, while acknowledging a slip in market share, assured investors the transformation of the Company's strategy would boost their agility and brand momentum moving forward, stating:

> For 2025, we met or exceeded our updated financial targets for system-wide sales, comparable sales growth and adjusted EBITDA as we ***pivoted during the second half of the year to amplify our value proposition in response to a weaker consumer backdrop and intense competitive promotional activity while prudently managing our expenses***. We also opened 279 new restaurants in fiscal 2025 with 96 restaurant openings in North America and 183 in international markets.
>
> ***In 2025, our U.S. market share slightly softened*** reflecting a system-wide sales decline of just under 1%. As Todd described, ***we are taking actions to further increase our agility as we move throughout 2026 and build momentum behind our transformation***. For the fourth quarter, global system-wide restaurant sales were $1.23 billion, down 1% in constant currency as higher international comparable sales and 1% global net restaurant growth were more than offset by lower comparable sales in North America.
>
> North American comparable sales decreased 5% in the fourth quarter driven by a 5.5% decrease in transaction comps across our restaurants. Carryout grew 1%, but was more than offset by declines in total delivery. The international team delivered another exceptional quarter with comparable sales improving 6%. ***We saw continued momentum across our key markets driven by new menu offerings, aggregator expansion and improved brand and marketing performance***. Total consolidated revenue for the fourth quarter was $498 million, down 6% as lower revenue at our domestic company-owned restaurants, North America commissary and all other business units was partially offset by higher international revenues.

(Emphasis added).

39. Moving to the Company's 2026 outlook, Defendant Thanawala presented guidance that suggested a mild continued decline in North American sales due to the soft consumer environment but significantly abated by Papa Johns' "innovation pipeline" and the Company's promotional strategy, in pertinent part:

> For 2026, we expect global system-wide sales to range between flat and low single-digits decline. ***For North America, we expect comparable sales to be down 2% to 4%. Our guidance reflects both the benefit of innovation pipeline and considerations around the current cautious consumer environment we expect to persist throughout 2026***. These factors are expected to influence our comparable

> sales trends through the year. Quarter-to-date comparable sales are down mid-single digits and we expect to end the first quarter in that range. ***We expect Q1 to be the softest quarter followed by improved trends in the second half of the year supported by the benefits of our product innovation, marketing co-ops and new aggregator marketing strategy.***
>
> . . .
>
> For 2026, we expect consolidated adjusted EBITDA to be between $200 million and $210 million. Recall that 2025 and 2026 are investment years as we support our transformation initiatives. ***In 2026, we expect to invest approximately $22 million in supplemental marketing and franchisee subsidies to support our menu strategy and enhance franchisee profitability as we lean into our promotional strategy in this year's innovation calendar***. As our transformation advances and we continue to stand up local co-ops, we do not expect to continue this $22 million investment after 2026.

(Emphasis added).

40. A question-and-answer segment followed the Defendants' prepared remarks, during which Defendants further detailed management's "prudent" projections during the following pertinent exchange:

> <Q: Brian John Bittner – Oppenheimer & Co. Inc. – MD & Senior Analyst> As it relates to your same-store sales, one of your competitors suggest that the QSR pizza industry as a whole is pretty stable, in fact growing and your same-store sales guidance for '26 is a 2% to 4% decline. And the question is just what is holding you back from holding or taking share in 2026 in your view? I realize you see a cautious consumer out there, but it seems like your guidance does assume a market share decline in 2026 and just would like your commentary on that.
>
> <A: Todd Allan Penegor> Brian, thanks for the question. As we think about 2026, our opportunity is really about bringing our innovation calendar to life. ***As you think about where some of the opportunities have been for us over the last year or so, it was really around recruiting new customers to our brand and we do believe that innovation is going to play a big role with that***. We're actually doing a nice job continuing to protect and drive frequency with our existing customer and you saw that in the prepared remarks with the work that we've been doing in Papa Rewards and the targeted CRM offers. But we do think as we go through this year bringing to life pan pizza, we're already seeing a nice mix in that product.
>
> ***The opportunity is to wear it in and really engage new customers into our brand and it's a great product once they try it and we're seeing good repeat rates early in the game***. The sandwich opportunity is an opportunity for us to start to expand

our total addressable market because we don't play in that category yet. It's doing really well in test so I would expect to see that coming to life during the course of this year. ***We know we have an opportunity to drive add-on with affordable sides***. So we've got that news coming through this year. ***And the single-serve pizza opportunity is an opportunity for us and that will come with a fun property tie-in.***

***So those are things that we know we have to drive on innovation to recruit new customers***. We also know we got to really compete better at the local level and ***we've been working hard over the course of the last 18 months as I've been here to get the co-ops back up. And as you heard in the prepared remarks, we now got 50 co-ops representing half the system sales in the U.S. up and running***. So all of those are the nice tailwinds in our business that we're going to see during the course of this year. Why do we have the guidance that we have with all of that news? Well, we've got a couple of things that we know we need to evolve and change.

We talked about pulling some of our rhythm breakers off the menu to really drive a focus on being not just the best pizza makers in the business, but over time being the best bakers. And the elimination of Papadias and Papa Bites will have an impact on our business, but it's absolutely the right thing to do from an ops complexity to create great service experiences time and again moving forward. So we're going to be focused on doing that. And ***we know we got to compete even stronger in the 3P channel and that's not just national offers, that's working local and the co-ops will help us really position to do that even stronger at the local level***.

So we're going to do the things that are right for the long term of the business, bring news, continue to drive our core pizza business. The good news is we sold 4% more pizzas in 2025 on a full year basis than we did the year before even though we saw some of the mix trade-downs and we think we'll continue to see some of the mix trade-downs from large and specialty into medium, which provides a little bit of pressure on our business. But ***we think it's a prudent approach to the business. We're managing our cost structure appropriately. We continue to invest to bring the news to life. And we really think that kind of prudent approach to our business will set ourselves up for long-term success***. Anything else, Ravi?

<A: Ravi Thanawala> Just, Brian, as we think about dimensionalizing the 2025 comp, 180 basis points of our comp pressure came from our sides business, 50 basis points were from channel mix and the balance was really a mix shift within the pizzas itself from larger sizes to some medium sizes and a little bit of a mix out of specialty into create your own. So there are a couple of dynamics there. But as Todd mentioned, ***we're really focused on like wearing in our innovation strategy and competing well.***

(Emphasis added).

41. Defendants further discussed how the Company planned to compete on value and recruit new customers in 2026, pertinently highlighting Papa Johns' need to "compete on both ends of the barbell," balancing higher margin innovation with a strong value proposition, during the following exchange:

> <Q: Isiah S. Austin – BofA Securities – Research Analyst> Isiah Austin on for Sara. Just briefly, how do you guys think about competing on value? I know it's kind of derivative of the previous question, but how do you think of competing on value when you think of going against a larger scale competitor? And then I just have a quick follow-up.
>
> <A: Todd Allan Penegor> I think ***on competing on value, we really think about how do we meet the consumer where they're at and we did that in partnership with our franchise system in the fourth quarter***. Our 50% carryout offer met them where they're at and that's a great offer and a great overall service experience because we do really well on the carryout side. Having $9.99 create your own did meet the consumer where they're at. But ***we have to compete on both ends of the barbell and that's why bringing this innovation is so important***. ***And you can see that as we come out with a compelling price point on pan at $11.99, it is still a trade-up from our $9.99 create your own offering. So that does help margin and check and dollars.***
>
> So it's going to have to be a balance. The work we're doing on innovation to have affordable sides certainly helps us on value. ***But what we really need to do is continue to recruit new customers*** because if we can get them into our rewards program, we're driving -- we see higher frequency and there's a lot of value that can be created with Papa Dough redemptions that we've seen nice uptick in the Papa Dough redemptions. And our frequency, as we said on the call, is 2.5x more in that with a loyalty member than a non-loyalty member. So we're just going to have to continue to drive folks over into that channel. ***And as we said earlier, we're going to have to make sure that we've got the appropriate offers in 3P to compete even better to make sure we've got not just our fair share of the pizza category, but our fair share of QSR in the 3P channel.***
>
> <A: Ravi Thanawala> And just like as a reminder, in our prepared remarks, we talked to an opportunity for capturing 200 basis points of margin upside on a 4-wall basis in the system with 160 basis points coming from supply chain and the balance coming from labor and market efficiencies. ***So even in this value-centric world, we're pulling levers to continue to maintain and drive our 4 walls***. And just more broadly from a 4-wall standpoint, in December 2024 we provided a figure that our domestic company-owned restaurant 4-wall margins were $150,000 and as we look at the numbers for year-end 2025, we're at $135,000.

> So we went slightly backwards, but like we have a clear plan that we just laid out to reaccelerate there. And then just from like a broader system standpoint, when we look at the Top 50% of our fleet right now in the U.S., AUVs are roughly $1.4 million at a 12% EBITDA margin. And our Top 75% of our fleet is at a $1.25 million AUV roughly at a 10% EBITDA margin. So we see opportunities to continue to accelerate 4-wall margins and compete by having this balance of value messaging that Todd referenced and wearing in our innovation calendar.

(Emphasis added).

*May 7, 2026*

42. On May 7, 2026, Defendants published a press release disclosing Papa Johns' first quarter fiscal 2026 results. In pertinent part, Defendants provided the following highlights:

> ***Highlights***
>
> - Global system-wide restaurant sales were $1.20 billion, a 3% decrease compared with the prior year first quarter.
> - North America comparable sales decreased 6.4% from a year ago as comparable sales from Domestic Company-owned restaurants were down 5.2% and North America franchised restaurants were down 6.7%; International comparable sales increased 3.6% compared with the prior year first quarter.
> - Opened 28 new restaurants system-wide, comprised of 8 restaurant openings in North America and 20 restaurant openings in International markets.
> - Net income was $7 million compared with $9 million in the prior year first quarter.
> - Adjusted EBITDA was $48 million compared with $50 million in the prior year first quarter.
> - Diluted earnings per common share was $0.21 compared with $0.27 in the prior year first quarter; adjusted diluted earnings per common share was $0.32 compared with $0.36 last year.

43. Defendant Penegor was quoted in the release, praising the first quarter's "continued strong performance in our International markets" and "in line" results for the North American region.

44. Defendant Penegor further assured investors the Company remains "focused on advancing [their] transformation strategy, ***including through an expanded range of value options and leaning aggressively into innovation***" (emphasis added). He continued, claiming that

"[e]xecution in these areas ***will enable us to meet customers where they are and unlock more layers of growth***," while pointing to promotional events "such as our collaboration with *Toy Story 5*" as "visible examples of the ***progress we are making*** in these areas" (emphasis added).

45. An earnings call followed the Company's quarterly publication, during which Defendant Penegor discussed North American results for the quarter and praised elements of the strategic transformation for maintaining the projected trajectory, in pertinent part:

> ***As anticipated, North America comparable sales ended the first quarter down mid-single digits, primarily driven by declining orders, which were pressured by lower new customer acquisition***. During the quarter, we continued to see resilience in core pizza and customers ordering multiple pizzas, with flat year-over-year pizza volumes, excluding 2 weeks that were impacted by severe weather and pies per order increasing 5% versus last year. Our loyalty customers continue to be a force for the company, and we added nearly 1 million new loyalty members in Q1. We also saw growth among our frequent and super frequent customers. And combined, these tiers make up approximately 30% of our customer base. Our loyalty customers are our most valuable customers, generating 5% higher ticket per order and ordering twice as often as non-loyalty members. This upside was offset by pizza mix shifting to smaller nonspecialty pizzas, resulting in low single-digit declines in overall pizza sales, excluding severe weather impacts.
>
> Outside of pizza, comparable sales were pressured by declines in size and desserts and lower new customer acquisition compared with last year. ***We are working with urgency to address areas of opportunity and capitalize on areas of strength through our transformation work. Our two largest opportunities to gain share are building on our improved value perception and leveraging our rebuilt innovation pipeline to win new customers, elevate our pizza order mix to more premium pizzas, drive add-ons and expand our total addressable market.***
>
> Starting with our value proposition, ***we are meeting customers where they are with popular offers***, including Buy One pizza, Get One free, $9.99 3-topping and our Papa Pairings. Leveraging our CRM platform, we meaningfully increased engagement with existing customers, which translated into higher subscriber order frequency in Q1. ***We are also leaning into innovation because newness is critical to winning new customers. We rebuilt our pipeline to deliver more frequent, compelling new product launches.*** And in the first 3 months of 2026 alone, we introduced 2 new menu platforms, Pan Pizza and oven-toasted sandwiches. These launches elevate our pizza mix and expand our total addressable market.
>
> . . .

> As we discussed on our last earnings call, ***we reinstated advertising co-ops across the U.S. to improve local targeting and relevance.*** While still early, 50% of our U.S. restaurant system is now supported by local co-ops across more than 50 markets. With our reestablished co-ops and sharpened value proposition, our local operators are aligning around a unified market strategy, accelerating our ability to win at the local level and driving benefits that will build throughout the year.
>
> . . .
>
> In summary, while the consumer environment has impacted the pace of our transformation, we are managing through these short-term headwinds and building for the future. We are confident that we are taking the right actions to transform the business and set Papa John's up for long-term success. We are making progress and are excited about the opportunities ahead.

(Emphasis added).

46. Defendant Thanawala similarly highlighted the purported benefits stemming from Papa Johns' strategic transformation and further reiterated fiscal 2026 guidance, taking into account "the benefit of our innovation pipeline and enhanced marketing strategy" while still claiming to be factoring in "considerations around the current cautious consumer environment." In pertinent part, Defendant Thanawala provided the following update:

> Now turning to our 2026 outlook. As discussed, ***we are making progress advancing the actions we're taking to transform the business***. We have ***taken steps to accelerate the top line throughout the year through an enhanced value offering, our rebuilt innovation pipeline and improved mix of national and local media through our reestablished local co-ops***. We're also driving efficiencies across our business with our supply chain optimization and cost savings initiatives and evaluating refranchising actions, which are progressing our business towards an asset-light model with higher free cash flow.
>
> With that in mind, ***we are reiterating our 2026 financial and operational metrics***. For 2026, we expect global system-wide sales to range between flat and low single-digit declines. For North America, we still expect comparable sales to be down 2% to 4%. ***Our guidance reflects both the benefit of our innovation pipeline and enhanced marketing strategy and considerations around the current cautious consumer environment***. ***April North American comparable sales are trending slightly worse than Q1 on a year-over-year basis, but consistent with Q1 on a 3-year stack.***

> ***We expect to build top line momentum in the second half of the year with sequential improvements versus the first half as we benefit from our product innovation, marketing co-op activations and meaningful brand collaborations and strengthened aggregator marketing strategy***. We expect the North America quarterly comps will be relatively consistent for the remainder of the year on a 3-year stack.
>
> Internationally, we continue to build on our transformation momentum and still expect comparable sales to increase between 2% and 4%. Our outlook reflects current geopolitical and consumer conditions, and we'll continue to monitor developments closely.

(Emphasis added).

47. When call opened for questions, an Oppenheimer analyst suggested Defendants derisk their guidance further. In pertinent part, the following exchange ensued during which Defendants strongly defended the decision to uphold the existing guidance, claiming not only that they did not need to soften the guidance, but that the guidance put forth was already derisked:

> <Q: Brian Johyn Bittner – Oppenheimer & Co., Inc. – MD & Senior Analyst> Just a question on the same-store sales guidance. As we look to the rest of the year, your comparisons don't get much easier for the rest of the year until the fourth quarter, but you are baking in a big improvement from the first half of the year. And I'm just curious why maybe not derisk the guidance a bit. I know you have a lot of initiatives to bend the trend in the second half of the year, but why not derisk the guidance a bit? And why, Ravi, should the 3-year trend be the right way for us to model comps as the year unfolds? Just any other color you can provide on 3-year trends being the right metric?
>
> <A: Todd Allan Penegor> Yes, Brian, I'll start and see if Ravi has anything to add on. If you start to think about where ***our year-over-year comparisons starting to soften and lapping over some of the competitive pressure from a year ago***, the back half, not all the way to the fourth quarter, ***starts to get a little bit easier***. But what we really wanted to look at is how does the business normalize with all the choppiness over the last couple of years. So very clear that our business, our transactions, how we're actually forecasting the outlook, and ***we think we've derisked it*** with really providing guidance that it remains fairly consistent on a stack 3-year basis.
>
> If you think about where we stand with all the second half of the year initiatives, ***we've launched some compelling innovation***. We've got Pan in the world. It's mixing really well with existing consumers. ***The opportunity is to continue to wear it in and recruit new with that great product***. We've got sandwiches in play, again,

mixing well with existing consumers, plays to refresh our Papa pairing offering, so great value with that in it. And we're really excited about our partnership with Toy Story 5 and driving 8-inch pizzas with some news as we work to compete in the back half of the year.

We'll continue to work to make sure we got our mix well so we compete on third party as the year progresses. ***But we think it's a prudent and realistic outlook for the year with lots of initiatives to support it, and that's considering the competitive and the consumer landscape that we're faced with at the moment.***

Anything else you'd say, Ravi?

<A: Ravi Thanawala> Yes. And Brian, you asked the question of why the 3-year stack. One, like as we looked at month-over-month and where we saw a bit of the trend come through is we saw some consistency there. So one, the underpinning data from Q1 and quarter-to-date Q2 has reflected that. Second is ***middle of 2025, we saw a meaningful step-up in competitive pressure from a promotional standpoint. And if you go back one more year, that was really when we saw the competitive pressure step up from an aggregator standpoint. So we're trying to take into account the competitive landscape, both from what's happening in the respective channels as well as what's been happening from a pricing pressure standpoint.***

(Emphasis added).

48. Elaborating further on the quarterly performance, Defendant Penegor further discussed upcoming promotional collaborations as a catalyst to fuel growth in the second quarter during the following pertinent exchange:

<Q: Todd Morrison Brooks – The Benchmark Company, LLC – Equity Research Analyst> First, I was wondering, Ravi, can you decompose the same-store sales between check and traffic? I'm just trying to get a sense of this more competitive approach to value as innovation ramps, kind of what was the drag on check that was part of that down 6.4% North American comp?

<A: Ravi Thanawala> Yes. Check was effectively flat in Q1, and that's been the trend in Q2 quarter-to-date as well. So the check has been there. And as a reminder, there was slight food cost deflation in Q1, some labor productivity and supply chain benefit. So 4-wall margins hung in there fairly well in Q1 because of that. ***But where the sales comp drag has really come has been from a transaction standpoint. If I take -- go one more click down, it was really in small transaction size from a number of pizzas. The transaction loss was in orders that contain only one or no pizzas. We continue to see order growth in multi-pie orders.***

> <A: Todd Allan Penegor> ***That's why we feel confident with the incoming of Toy Story 5 and that partnership that can address that one pie order***. Our challenge really is people are managing their overall check, right? And we're still seeing some of the leakage in size. We've not got cheesy garlic bread as a compelling price point side. We're going to have to continue to make sure sides are relevant. That's the opportunity to allow us to drive some check and mix up, but haven't planned for that with the tough consumer environment. So ***our guidance reflects where we stand today.***

(Emphasis added).

*June 30, 2026*

49. On June 30, 2026, Defendants published a press release announcing that Defendant Thanawala is "leaving Papa Johns to assume a chief financial officer position at another company." The departure was immediate, but Defendant Thanawala was to remain "available to Papa Johns in an advisory capacity until July 31, 2026."

50. The above statements in Paragraphs 22 to 48 were false and/or materially misleading. Defendants created the false impression that they possessed reliable information pertaining to the effectiveness and ongoing impact of the Company's strategic transformation as well as their resulting projected growth outlook for the North American region, while also minimizing risk against their projections from cautious consumer sentiment, competition woes, promotional seasonality, and more general macroeconomic fluctuation. In truth, Papa Johns' strategic transformation was taking considerably longer than the projections had suggested; the Company was simply ill equipped to "meet the consumer where they're at."

***The Truth Emerges during Papa Johns' Second Quarter 2026 Earnings Report***

<u>*August 6, 2026*</u>

51. On August 6, 2026, Defendants published their second quarter fiscal 2026 results, acknowledging a continuing sequential deterioration in annual performance comparisons for the North American region, in pertinent part, as follows:

> <u>***Highlights***</u>
>
> - Global system-wide restaurant sales were $1.20 billion, a 4.8% decrease compared with the prior year second quarter.
> - North America comparable sales decreased 8.3% from a year ago as comparable sales from Domestic Company-owned restaurants were down 8.9% and North America franchised restaurants were down 8.2%; International comparable sales increased 1.5% compared with the prior year second quarter.
> - Opened 50 new restaurants system-wide, comprised of 9 restaurant openings in North America and 41 restaurant openings in International markets.
> - Net income was $9 million compared with $10 million in the prior year second quarter.
> - Adjusted EBITDA was flat year over year at $53 million.
> - Diluted earnings per common share was $0.24 compared with $0.28 in the prior year second quarter; adjusted diluted earnings per common share was $0.46 compared with $0.41 last year.

52. As part of the release, Defendant Penegor was quoted, elaborating on the results, acknowledging the slowdown, and informing investors of the sudden suspension of the Company's dividend, in pertinent part, as follows:

> Second quarter results reflected continued momentum in our International business, where we delivered our seventh consecutive quarter of positive comparable sales, and ongoing headwinds in North America driven by the softer consumer environment, lower order volumes, and a highly promotional QSR marketplace," said Todd Penegor, President and CEO.
>
> "While ***our transformation is taking longer than anticipated***, we continue to execute our strategy with discipline and focus and are seeing encouraging progress, including a growing and highly engaged Papa Rewards membership, supply chain savings, and AI-driven improvements to the customer ordering experience. By accelerating investments to strengthen our competitive position, improve restaurant economics, and attract new customers, we can build an even stronger foundation to gain market share and drive sustainable long-term growth. Accordingly, ***the Board has decided to suspend the Company's quarterly dividend beginning with the***

> ***third quarter of 2026 so that we have greater flexibility to make these investments and maintain our strong balance sheet***," continued Penegor.

(Emphasis added).

53. The release additionally informed investors that Papa Johns was "updating its 2026 annual guidance," by reducing projections across various metrics, pertinently as produced in the following table:

| **Financial Metric** | **Prior 2026 Outlook** | **Current 2026 Outlook** |
|---|---|---|
| Global system-wide restaurant sales | Flat to Down Low Single-Digits | Down (2)% to (4)% |
| North America comparable sales | Down (2)% to (4)% | Down (6)% to (8)% |
| International comparable sales | Up 2% to 4% | Up 1% to 3% |
| North America gross openings | 40 to 50 | 40 to 50 |
| International gross openings | 180 to 220 | 180 to 220 |
| Adjusted EBITDA | $200 million to $210 million | $180 million to $190 million |
| Adjusted Depreciation and amortization | $70 million to $75 million | $70 million to $75 million |
| Interest expense (net) | $35 million to $40 million | $35 million to $40 million |
| GAAP effective tax rate | 30% to 34% | 30% to 34% |
| Capital expenditures | $70 million to $80 million | $70 million to $80 million |
| Diluted shares outstanding | Approximately 33 million | Approximately 33 million |

54. During the same-days earnings call Defendant Penegor elaborated further on the "longer than expected" transformation process and the Company's reduced guidance, stating, in pertinent part:

> At the same time, we felt the impacts of the softer consumer backdrop and highly promotional QSR environment, which have continued to challenge our financial performance. And while our focus is unrelenting, ***it's clear that our transformation is taking longer than expected.*** We know that ***we must execute better and move faster***.
>
> And as we look ahead, we're making adjustments where needed across our strategic priorities and leadership team to improve results and position Papa John's for 2027 and beyond.

(Emphasis added).

55. Discussed the reduced guidance and the basis for it, Defendant Penegor continued, elaborating, in pertinent part, as follows:

> Within our core pizza business, orders with multiple pizzas again saw improvement with pies per order up 6%, positively impacting our overall system ticket, which was flat compared with last year. ***This upside was offset by pizza mix shifting to smaller non-specialty pizzas, resulting in mid-single-digit declines in overall pizza sales.***
>
> Outside of pizza, ***comparable sales were pressured by declines in sides and desserts***, while sales of our new sandwiches almost fully offset the removal of Papadias and opened an entirely new food category for us without complicating our make line and operations.
>
> Taking into account our performance and the pressured consumer environment, which we expect to continue throughout the year, ***we have revised our outlook for 2026.*** Chris will provide more detail in his remarks, but at a high level, ***we now expect global system-wide sales to decline between 2% and 4% compared to last year and adjusted EBITDA between $180 million to $190 million, which now includes an incremental $18 million of investment to support our franchisees and accelerate our transformation***.
>
> While ***our financial performance isn't where we'd like it to be***, we have a clear understanding of how to improve our results and gain market share. These focus areas work in tandem with our ongoing strategic transformation efforts.
>
> As we have discussed previously, we continue to see 2 clear opportunities to gain share: continuing to strengthen our value perception with more targeted personalized offers, and a consistent, elevated customer experience and attracting new customers through a sharper aggregator strategy, total addressable market expansion, our rebuilt innovation pipeline and a reenergized local presence through reestablished co-ops.

(Emphasis added).

56. Defendant Penegor closed the Company's prepared remarks by reiterating that the transformation is slower than they would like and summarizing the new strategies going forward they will undertake to complete it, in pertinent part:

> In summary, we are executing with discipline, investing for the long term and positioning the business for improved comparable sales trends in 2027
>
> . . .
>
> While ***our transformation is taking longer than we anticipated***, we are building the operational and financial foundation to drive sustainable growth. As I've laid out today, ***we'll achieve this by competing on value with more targeted,***

> ***personalized offers, and consistent elevated customer experience, targeted investments in customer acquisition and brand elevation, and disciplined portfolio optimization and supply chain improvements that strengthen unit economics***.
>
> This strategy is similar to the transformation playbook that has proven successful internationally, and we are confident it will allow us to compete better and win in North America.

(Emphasis added).

57. Papa Johns' newly appointed Chief Financial Officer, Christopher K. Collins ("CFO Collins"), elaborated on the financial aspects of the Company's second quarter performance. In pertinent part, he outlined the setbacks as follows:

> ***Total consolidated revenue for the second quarter was $482 million, down 9% as lower revenue for our domestic company-owned restaurants***, North America Commissary, North America Franchising and all other business units was partially offset by higher international revenues.
>
> . . .
>
> Revenues in our North America Franchising segment decreased $3 million, primarily due to lower comparable sales at our franchise restaurants. And all other business unit revenues decreased $8 million, driven by lower advertising fund revenue and digital fees as a function of lower system sales. Partially offsetting these declines was a $1 million increase in international revenue.

(Emphasis added).

58. CFO Collins continued, providing additional details surrounding Papa Johns reduced guidance and further detailing a shift in strategy as the Company unveils a new plan to invest an additional $35 million in marking and franchising subsidies, in pertinent part as follows:

> Now turning to our 2026 outlook. As discussed, we are revising our outlook to incorporate year-to-date results in a challenging environment, which we expect to continue for the balance of the year. ***For 2026, we now expect global system-wide sales declines to range between 2% and 4%.***
>
> ***For North America, we expect comparable sales to be down 6% to 8%.*** July North America comparable sales trended in line with Q2 on a year-over-year basis but decelerated on a 3-year stack. We expect sequential improvement in North America

> comp sales in the second half of the year, supported by our marketing co-op activations, a strengthened aggregator marketing strategy, our new CRM program and prior year comparisons.
>
> Accounting for the impact of geopolitical and consumer conditions, ***we now expect international comparable sales to increase between 1% and 3%***.
>
> . . .
>
> ***For 2026, we now expect consolidated adjusted EBITDA to be between $180 million and $190 million. We now plan to invest approximately $35 million in total supplemental marketing and franchisee subsidies***, including the incremental $18 million added for the back half of this year to ***accelerate our transformation***, as Todd described. We expect that elevated investment to continue into 2027.

(Emphasis added).

59. During the question-and-answer segment, Defendant Penegor discussed the difficulties facing the transformation process and the areas in which the Company ought to have executed more effectively, in pertinent part, during the following exchanges:

> <Q: Andrew Strelzik – BMO Capital Markets Equity Research – Senior Restaurant Analyst> Obviously, a lot going on, a lot of strategies that you're implementing and working through. I guess, if you take a step back in your view, where have broadly the turnaround strategies had the intended impact or had the most impact as you intended?
>
> And, kind of, where are you most lagging versus your expectations in trying to make up ground, understanding, obviously, it's a difficult operating environment.
>
> <A: Todd Allan Penegor> Yes. Thanks, Andrew, for the question. On the transformation, I think some of the work that we've done over the course of the last couple of years to really rebuild our technology platform create less friction in our ordering through our app, through the website, the work we've done with AI to leverage the data and better connect to the consumer through our CRM program. All of those are strong foundational elements that we've continued to build.
>
> ***We rebuilt our innovation pipeline. We brought some news to the table. We're not bringing in as many new consumers with the innovation as we had expected***. But I do feel good that we've done a nice job on those fronts. And ***we've raised the bar on operational excellence, even though we know we've got some inconsistencies and opportunities to continue to do that.***

I think where we've been probably the ***most challenged is we haven't been able to get the full force of the local co-ops reestablished across the entire system***. We're making progress on that front, but ***we've now hired out our field marketing team to better support those co-ops*** and make sure we've got a really balanced and thoughtful approach to what national messaging does as well as local messaging to really compete and win and really have a strong barbell at both the national and the local level.

And importantly, ***what we need to really get aligned on is where do we find the right balance between driving transactions and protecting margin. We know we have to meet the consumer where they're at.***

***We can't just live on the quality and the messaging of better ingredients, better pizza.*** We're going to continue to do that with our fan favorites at affordable price points and continue to deliver on the rest of this year. But we know we're going to have to pulse in some appropriate discounting to continue to drive frequency and keep our existing customers engaged. But we try to recruit some new customers through that.

But we're going to be smart about the discounting. We're going to pulse it appropriately, and we're going to leverage the tools at our disposal, especially CRM with some of the optimized AI engine work that we've done to really target those investments.

. . .

<Q: Todd Morrison Brooks – The Benchmark Company, LLC – Equity Research Analyst> Okay. Great. And then my follow-up, Todd, is product innovation was a driver that you got -- and actually more of a strategy pivot coming into this year versus just trying to compete on value. You spoke about -- and which is almost offsetting the lost revenues from Papadias and Papa Bites.

I'm just wondering, given that we're not necessarily seeing it in the same-store sales results, how are the different innovations performing relative to plan? And is this just a tough environment to get a consumer that's so value-focused to want to try something new versus just the tried and true at a lower price point?

<A: Todd Allan Penegor> Yes, no, I think the consumer is very cautious in making choices with their hard-earned dollars. And in an environment where you want to make sure every one of your dollars works as hard as possible for yourself, you do kind of go back to your tried-and-true favorites that you know can deliver on the experience and not disappoint. And in an environment like that, the role of innovation is a little more challenging to break through.

We think about our pan launch, it mixed really well with our existing consumers, but ***didn't bring in the number of new consumers that we probably would have***

> ***expected. The same thing with Toy Story, we got a lot of great excitement to keep the brand cool, hip in the discussion, but it mixed well with existing customers but didn't bring as many new in as we would have wanted.***
>
> And I would look at sandwiches as a little more of a long-term opportunity to expand our TAM, as we really think about that as a replacement for Papadias and taking the rhythm-breakers out of the restaurant.
>
> But you are right, innovation in and of itself is a little more challenged to bring in new customers in this environment. ***I think we can do a better job really telling our story on the third-party aggregator channel and what we can bring that's new, unique, and different to provide new access to innovation, and we're adjusting some of our plans moving forward to do that.***
>
> I think that's an opportunity for us. And we're going to continue to really make sure that we find that right balance between innovation, talking about our tried-and-true favorites on the more premium side of the menu at affordable price points and being a little sharper and pulse in a little more value messaging to make sure that we've got a really strong barbell to drive awareness.
>
> But those are good innovations. They're going to play a nice role on our calendar. ***Over time, I do think they will bring in new customers. We're just not seeing that in the environment today***.

(Emphasis added).

60. Speaking directly to the Papa Johns' competition and their comparative performance, Defendant Penegor suggested they were losing margins due to additional market entrants from the likes of convenience stores and gas stations while at the same time acknowledging they failed to "meet the customer" as much as their competitors in terms of discounts and promotional offerings, in pertinent part:

> <Q: Michael A. Tamas – Oppenheimer & Co. Inc. – Director & Senior Analyst> This is Mike Tamas on for Brian. Todd, you deployed a lot of new initiatives, and I would have thought that you'd see some improvements in the business by now. So do you think there's a category headwind that you're fighting?
>
> And maybe specifically to the second quarter, what do you believe the category sales trends were in the quarter versus the negative 8% that you guys saw?
>
> <A: Todd Allan Penegor> Yes, no, it's a great question. I do think all of QSR has had a lot of aggressive discounting. ***Pizza QSR has been even more so aggressive,***

***and we probably didn't meet the consumer as much as we should have in the course of the second quarter as we protected margin a little bit more.***

But I would -- from where we sit, we'd say that the QSR pizza category was down slightly within the quarter. But the pizza category is quite broad. ***There's a lot of other folks now competing in pizza, when you think about convenience stores, gas stations, et cetera.***

So there still is an appetite for broader pizza, and we've got to really consider how we compete, where we show up and how we provide access to the brand. And those are all things that we're addressing in the acceleration of the transformation efforts that we have with the investment that we discussed today.

. . .

<Q: Grace for Sara Senator – Bank of America – Analyst> This is [ Grace ] on for Sara. You cited a softer consumer environment as a reason for the U.S. comp weakness, but some other restaurants have reported stronger results this quarter. What do you believe explains that difference?

Is the difference the customer base since Papa John's skews lower income than other QSRs? Is it the competition within the pizza category, including independence on the aggregators or maybe competition from non-pizza competitors, other QSRs, and also convenience stores? And then I have one follow-up after that.

<A: Todd Allan Penegor> Yes. I think the pizza category has evolved, not just on who competes in the third-party aggregator space. And it's not just competition now against pizza, it's competition against all of QSR, but good quality pizza is showing up everywhere. ***You look at some of the big C-store chains, your local gas stations, they all have pizza.***

So ***we've got to be positioned to compete both on price and quality in a broader environment moving forward***. But if you look at QSR pizza category, as I said earlier, it would be down slightly.

But what has happened in our category has become very competitive on price. We had our 2 largest competitors have deep discounting for the better part of at least half the quarter in one instance and the full quarter in another instance. And ***we didn't answer the bell as strongly as we should have.***

We had deep discounting for 1 week in the quarter. We had Papa Pairings running throughout. We had sharp price points on our everyday favorites on the premium side of the menu. But ***we've got to get that -- the balance of the barbell reworked to compete more strongly*** in the competitive and the consumer landscape that we're facing today.

(Emphasis added).

61. The aforementioned press releases and statements made by the Individual Defendants are in direct contrast to statements they made during the above-referenced earnings calls, press releases, and shareholder presentations. In those publications, Defendants continually praised and claimed confidence in their strategic transformation, they claimed their rebuilt innovation pipeline would provide a distinct advantage and "play a big role" in recruiting new customers; and highlighted a "promotional cadence" that would be "priced appropriate for where the customer is." All the while, Defendants repeatedly minimized risks associated with the ongoing cautious consumer environment, aggressive promotional campaigns, seasonal fluctuations, and increased competition. In fact, Defendants specifically claimed their projections were both "reasonably prudent" and "derisked."

62. Investors and analysts reacted immediately to Papa Johns' revelation. The price of Papa Johns' common stock declined dramatically. From a closing market price of $29.75 per share on August 5, 2026, Papa Johns' stock price fell to $24.64 per share on August 6, 2026, a decline of about 17.18% in the span of just a single day.

63. A number of well-known analysts who had been following Papa Johns lowered their price targets in response to Papa Johns' disclosures. For example, Mizuho, while reiterating their neutral rating and cutting their price target nearly 19% summarized the setbacks as an "underwhelming Q2 and a disappointing Q3-to-date SSS growth." The analyst continued, noting that the "SSS growth guidance reinforce[s] our view that PZZA is continuing to lose share."

64. Similarly, Oppenheimer, which reduced their "EBITDA estimates by an average of ~12% through '27," highlighted that "trends [had] not improved into 3Q26, with majority of the softness seemingly PZZA-specific despite many initiatives in play." The Oppenheimer analyst

noted management has pointed to additional "incremental investments through '27," which, when coupled with the soft sales outlook, "caused the '26 EBITDA outlook to be revised to $180-190M, below Street's $201.1M estimate.

65. CFRA also highlighted the "disappointing" Q2 results and the "materially lowered 2026 guidance." In pertinent part, the analyst focused on the reported adjusted EPS metric of $0.46 which "met estimates but reflected defensive cost reductions rather than growth-driven improvements." CFRA further noted the "most concerning development" for investors was the combination of "accelerating North America comp sales declines" and "international growth decelerat[ing] sharply."

66. The fact that these analysts, and others, discussed Papa Johns' declining comp sales and reduced projections suggests the public placed significant weight on Papa Johns' prior sales growth. The frequent, in-depth discussion of Papa Johns' guidance confirms that Defendants' statements during the Class Period were material.

***Additional Scienter Allegations***

67. During the Class Period, Defendants acted with scienter in that they knew, should have known, or otherwise were deliberately reckless in not knowing that the public statements disseminated on behalf of Papa Johns were materially false and misleading at the time they were made. Defendants had actual knowledge of, or access to, non-public information concerning the potential of the Company's strategic transformation, namely, the anticipated and actual adoption of the innovations stemming from the Company's rebuilt pipeline, the level of consumer softness impacting Papa Johns' market, the competitive pricing and promotional environment, and the ability of Papa Johns to execute on its transformation to drive adoption of new innovation and promotional offerings to stimulate comparative sales and new customer growth in North America.

68. Nothwithstanding such, Defendants repeatedly and affirmatively represented to investors that Papa Johns was well positioned to return its North American business to growth and could rely upon its rebuilt innovation pipeline, competitive price points, and promotional events to reach its 2026 fiscal targets.

69. Yet, Defendants made selective and misleading disclosures in repeated claims of “substantial,” “visible” progress in its strategic transformation, the development of its innovation pipeline, the implementation of such innovations, their purported appeal and adoption, and the Company’s overall ability to “meet the consumer where they're at,” in terms of pricing, access, and demand.

70. Notably, Defendants repeatedly discussed the risks of a competitive, promotional environment throughout the class period, but simultaneously referred to its own promotional events as evidence of the “progress” being made in the company’s transformation. Yet, ultimately, while these promotional events “mixed well with existing customers,” they “didn’t bring in the number of new customers” that Papa Johns projected to its investors.

71. Defendants’ scienter was further evidence by their repeated minimalization of ongoing consumer softness trends. Indeed, throughout the Class Period, Defendants repeatedly acknowledged the cautious consumer environment. Nevertheless, Defendants continued to reassure investors that their transformation strategy was working, that their innovation was taking hold, and that they were meeting the customer “where they are” on price and value. Defendants misled investors into believing the ongoing consumer caution was appropriately risked in the Company’s projections and that the transformation would result in sustainable profitable growth even against depressed consumer sentiment.

72. Even in the face of continued consumer softness, Defendants reiterated their full-year projections following the first quarter of 2026. Defendants assured investors they had a plan to "build top line momentum" and achieve "sequential improvements" into the back half of the year. Defendant Thanawala claimed benefits from Papa Johns' "product innovation, marketing co-op activations and meaningful brand collaborations and strengthened aggregator marketing strategy."

73. Moreover, when faced with analyst suggestions to "derisk the guidance a bit" rather than reiterate it, Defendant Penegor claimed the guidance was already derisked and was both a "prudent and realistic outlook for the year with lots of initiatives to support it."

74. Yet, ultimately, those reassurances fell flat. Defendants eventually acknowledged on August 6, 2026, that the "transformation was taking longer than expected," that the "rebuilt" innovation pipeline was "not bringing in as many new customers" as management expected, and that significant additional promotional investment would be required to even achieve the significantly reduced guidance Papa Johns was now putting forth.

75. Defendants' scienter was also evidenced by the abrupt, surprise departure of Defendant Thanawala. Notably, he held the position of Papa Johns' North American President for only around 7 months, ultimately leaving on June 30, 2026, just two days after the end of the second quarter of 2026 and two months before that quarter's results would be unveiled to the investing public, along with the realization that the existing North American guidance and the overall claims of transformative progress made during Defendant Thanawala's tenure were untenable. Ultimately, in the first quarterly update following his departure, North American guidance was gutted, and Papa Johns disclosed the transformation was taking significantly longer than planned.

***Loss Causation and Economic Loss***

76. During the Class Period, as detailed herein, Defendants made materially false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Papa Johns' common stock and operated as a fraud or deceit on Class Period purchasers of Papa Johns' common stock by materially misleading the investing public. Later, Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of Papa Johns' common stock materially declined, as the prior artificial inflation came out of the price over time. As a result of their purchases of Papa Johns' common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages under federal securities laws.

77. Papa Johns' stock price fell in response to the corrective event on August 6, 2026, as alleged *supra*. On August 6, 2026, Defendants disclosed information that was directly related to their prior misrepresentations and material omissions concerning Papa Johns' strategic transformation, forecasting processes, and growth guidance.

78. In particular, on August 6, 2026, Papa Johns announced significantly below-market growth expectations, reducing their own prior guidance for fiscal year 2026 North American comparable sales from a 2-4% decline, down to a considerable 6-8% decline. Defendants further announced the strategic transformation was "taking longer than expected," and the Company needs to "execute better and move faster," ultimately announcing a strategic shift toward considerably more promotional investment.

***Presumption of Reliance; Fraud-On-The-Market***

79. At all relevant times, the market for Papa Johns' common stock was an efficient market for the following reasons, among others:

(a) Papa Johns' common stock met the requirements for listing and was listed and actively traded on the NASDAQ during the Class Period, a highly efficient and automated market;

(b) Papa Johns communicated with public investors via established market communication mechanisms, including disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(c) Papa Johns was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

(d) Unexpected material news about Papa Johns was reflected in and incorporated into the Company's stock price during the Class Period.

80. As a result of the foregoing, the market for Papa Johns' common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in Papa Johns' stock price. Under these circumstances, all purchasers of Papa Johns' common stock during the Class Period suffered similar injury through their purchase of Papa Johns' common stock at artificially inflated prices, and a presumption of reliance applies.

81. Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense

that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

***No Safe Harbor; Inapplicability of Bespeaks Caution Doctrine***

82. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint. As alleged above, Defendants' liability stems from the fact that they provided investors with growth projections while at the same time failing to maintain adequate forecasting processes. Defendants provided the public with forecasts that failed to account for Papa Johns' strategic transformation's inability to drive new consumer growth in a softer consumer environment and/or failed to adequately disclose the fact that the Company at the current time did not have adequate forecasting processes or an adequate understanding of how to meet their clientele "where they are."

83. To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

84. Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of Papa Johns who knew that the "forward-looking statement" was false. Alternatively, none of the historic or present-tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of

future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## CLASS ACTION ALLEGATIONS

85. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Papa Johns' common stock during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

86. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Papa Johns' common stock was actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Papa Johns or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. As of July 31, 2026, there were 32.92 million shares of the Company's common stock outstanding. Upon information and belief, these shares are held by thousands, if not millions, of individuals located throughout the country and possibly the world. Joinder would be highly impracticable.

87. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

88. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

89. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Papa Johns;

(c) whether the Individual Defendants caused Papa Johns to issue false and misleading financial statements during the Class Period;

(d) whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

(e) whether the prices of Papa Johns' common stock during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(f) whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

90. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the

damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

***Against All Defendants for Violations of***

***Section 10(b) and Rule 10b-5 Promulgated Thereunder***

91. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

92. This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

93. During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon. Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Papa Johns common stock; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Papa Johns' securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

94. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Papa Johns' securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company.

95. By virtue of their positions at the Company, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

96. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control. As the senior managers and/or directors of the Company, the Individual Defendants had knowledge of the details of Papa Johns' internal affairs.

97. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of the

Company. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Papa Johns' businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Papa Johns' common stock was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning the Company which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Papa Johns' common stock at artificially inflated prices and relied upon the price of the common stock, the integrity of the market for the common stock and/or upon statements disseminated by Defendants, and were damaged thereby.

98. During the Class Period, Papa Johns' common stock was traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Papa Johns' common stock at prices artificially inflated by defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said common stock, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Papa Johns' common stock was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Papa Johns' common stock declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

99. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

100. As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's common stock during the Class Period, upon the disclosure that the Company's strategic transformation was not having the intended impact on new customer acquisitions, protected margins over providing a value proposition, and was overall taking longer than previously suggested.

**COUNT II**

***Against the Individual Defendants***

***for Violations of Section 20(a) of the Exchange Act***

101. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

102. During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about Papa Johns' misstatements.

103. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information, and to correct promptly any public statements issued by Papa Johns which had become materially false or misleading.

104. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and

public filings which Papa Johns disseminated in the marketplace during the Class Period concerning the misrepresentations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Papa Johns to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Papa Johns' common stock.

105. Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause Papa Johns to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

106. By reason of the above conduct, the Individual Defendants and/or Papa Johns are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B. Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiff and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

**DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury.

Dated: September 2, 2026

Respectfully submitted,

*/s/ David W. Garrison*
David W Garrison (KY Bar No. 98258)
**BARRETT JOHNSTON MARTIN & GARRISON, PLLC**
200 31st Avenue North
Nashville, TN 37203
Tel.: (615) 244-2202
Fax: (615) 647-9242
Email: dgarrison@barrettjohnston.com

-and-

Adam M. Apton (*pro hac vice* forthcoming)
**LEVI & KORSINSKY, LLP**
33 Whitehall Street, 27th Floor
New York, New York 10004
Tel.: (212) 363-7500
Fax: (212) 363-7171
Email: aapton@zlk.com

*Attorneys for Plaintiff*